Amos Lee KING, Petitioner-Appellant,

v.

Michael W. MOORE, Secretary Florida Department of Corrections, Respondent-Appellee.

No. 98-2928.

United States Court of Appeals,

Eleventh Circuit.

Nov. 30, 1999.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-1727-CIV-t-24e), Susan C. Bucklew, Judge.

Before EDMONDSON, COX and BLACK, Circuit Judges.

COX, Circuit Judge:

Amos Lee King, a Florida inmate under a death sentence for murder, appeals the district court's denial

of relief on his 28 U.S.C. § 2254 petition.[1] We affirm.

I. Background

The Florida Supreme Court described King's crime thus:

On March 18, 1976, the appellant was an inmate at the Tarpon Springs Community Correctional Center, a work release facility, serving a sentence for larceny of a firearm. On this date a routine bed check was made by James McDonough, a prison counselor, at about 3:40 a. m. The appellant King was absent from his room. The counselor began a search of the building grounds and found the appellant outside the building. Appellant was wearing light-colored pants which had the crotch portion covered with blood. The counselor directed King back to the office control room inside the building. When the counselor turned to get handcuffs, King attacked him with a knife. A struggle ensued, and the counselor received several cuts and stab wounds. King left the office, then returned and found the counselor talking to his superior on the phone. He stabbed the counselor again and cut the telephone cord.

At approximately 4:05 a. m., the police and fire personnel arrived at the scene of a fire at a house approximately 1500 feet from the correctional center. The police officers discovered the body of Natalie Brady. She had received two stab wounds, bruises over the chin, and burns on the leg. An autopsy revealed other injuries, which included bruises on the back of the head, hemorrhaging of the brain, hemorrhaging of the neck, and broken cartilage in the neck. There was a ragged tear of the vagina, apparently caused by the wooden bloodstained knitting needles which were found at the

---

[1]The pre-1996 version of § 2254 governs this petition because it was filed in 1992. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).

scene, as well as evidence of forcible intercourse. Appellant's blood type was found in Brady's vaginal washings. The medical examiner attributed Mrs. Brady's death to multiple causes and established the time of death as 3:00 a.m. Arson investigators concluded that the fire was intentionally set at approximately 3:00 to 3:30 a.m.

*King v. State,* 390 So.2d 315, 316-17 (Fla.1980).

A jury convicted King of the capital murder of Natalie Brady, and on the jury's recommendation the court sentenced King to death. His first round of appeals and postconviction challenges to his conviction and sentence ended with the Eleventh Circuit's granting the writ as to his sentence because King's sentence-phase counsel was ineffective. *See King v. Strickland,* 748 F.2d 1462 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). There was a new sentencing hearing before a jury. On a unanimous jury recommendation, the trial court resentenced King to death. The Florida Supreme Court affirmed on appeal, *King v. State,* 514 So.2d 354 (Fla.1987), and the U.S. Supreme Court denied certiorari, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). King then sought postconviction relief concurrently in two fora: he moved for relief in the state trial court under Fla. R.Crim. P. 3.850, and he petitioned the Florida Supreme Court for a writ of habeas corpus. The trial court held a hearing on the Rule 3.850 motion and denied relief. The Florida Supreme Court denied the petition for a writ of habeas corpus, *King v. Dugger,* 555 So.2d 355 (1990), and later affirmed the trial court's denial of relief on the Rule 3.850 motion, *King v. State,* 597 So.2d 780 (1992).

King then filed the present § 2254 petition, asserting sixteen claims.[2] The district court denied relief on every claim. In this appeal, King pursues only six of the petition's claims. We have examined the record and conclude that only two of the claims on appeal—the two to which counsel devoted oral argument time—merit extended discussion.[3] The first is that the Florida Supreme Court did not engage in proper sentencing-factor reweighing or harmless-error analysis after striking aggravating factors, thus contravening

[2]The claims are set out in an appendix to this opinion.

[3]The others are briefly discussed in a footnote at the end of this opinion.

2

the Eighth Amendment principles enunciated (for instance) in *Sochor v. Florida,* 504 U.S. 527, 540, 112 S.Ct. 2114, 2123, 119 L.Ed.2d 326 (1992). The second is that the prosecution exercised race-based peremptory strikes, thus entitling King to a new sentencing hearing under *Batson v. Kentucky,* 476 U.S. 79, 96-97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). On review of a § 2254 petition, "federal district court findings are deemed correct unless clearly erroneous.... Questions of law and mixed questions of law and fact, on the other hand, mandate *de novo* review." *Freund v. Butterworth,* 165 F.3d 839, 861 (11th Cir.1999) (en banc).

## II. Discussion

A.    *Sochor* Claim

The State argues, and we agree, that a procedural default bars this claim. Following the unanimous jury recommendation of death, the resentencing court found that the State had proven five aggravating circumstances beyond a reasonable doubt, one of which was that King had knowingly created a great risk of death to many persons by setting fire to Natalie Brady's house. The court rejected all asserted mitigating factors, both statutory and nonstatutory. On appeal, the Florida Supreme Court sua sponte addressed the sufficiency of the evidence to support the factors. The court concluded that the evidence was insufficient to support a finding of the creating-a-great-risk-to-many-persons aggravator. The court declined to vacate King's sentence, however, explaining that "[a]fter striking this factor, however, we are left with four valid aggravating circumstances and no mitigating circumstances. We therefore affirm King's sentence of death." *King v. State,* 514 So.2d 354, 360 (Fla.1987). This is the disposition that King claims violates his Eighth Amendment rights.

Although the asserted error occurred during direct review, King did not mention this treatment of his sentence in his petition for rehearing before the supreme court, and the sufficiency of this review was not a subject of his original petition for habeas corpus filed in the same court. Nor did it form the basis of a claim

for relief in his petition under Rule 3.850.[4]  Under our precedent, King's failure to present this kind of claim

to the Florida state courts bars it.  *See Davis v. Singletary,* 119 F.3d 1471, 1481 (11th Cir.1997).

There is, however, a small complication here:  the State concedes[5] that the failure to challenge the

supreme court's harmless-error analysis in the Rule 3.850 petition does not bar the claim, because (according

to the State) a trial court could not review a supreme court action for constitutionality.  The State's concession

notwithstanding, we think that *Davis* 's rule still bars the claim.  As the State goes on to point out, Florida law

provides King with a viable means of raising this constitutional error before the Florida Supreme Court:  an

original habeas corpus proceeding before that court.  The Florida Supreme Court indeed routinely entertains

such petitions in death cases.  *See, e.g., Teffeteller v. Dugger,* 734 So.2d 1009, 1024-29 (Fla.1999);  *Van*

*Poyck v. Singletary,* 715 So.2d 930 (Fla.1998);  *Bottoson v. Singletary,* 685 So.2d 1302 (Fla.1997);  *Dougan*

*v. Singletary,* 644 So.2d 484 (Fla.1994);  *Occhicone v. Singletary,* 618 So.2d 730 (Fla.1993).  So King had

an avenue for relief in Florida courts on this claim.

But King would now stumble on a bar to habeas corpus review by the Florida Supreme Court—that

the issue could have been, but was not, raised in an earlier proceeding.  *See Teffeteller,* 734 So.2d at 1024.

That bar was, indeed, the only one the supreme court mentioned in refusing to consider on habeas petition

a claim identical to the one that King has made here;  the petitioner had not made the claim in his earlier

habeas petition.  *See Mills,* 606 So.2d at 622.  Thus, King should have presented the claim in his petition for

---

[4]King's § 2254 petition at best hinted at this claim.  It is not separately enumerated.  There is only a single sentence, deeply embedded in his *Espinosa* claim, that "[o]n direct appeal, the Florida Supreme Court gave no consideration to the impact of these invalid aggravating factor[s] on the jury's weighing.  An adequate harmless error analysis was not conducted.  *See Sochor;  Espinosa.*"  (R.1-1 ¶ 13, at 23.)  Understandably, the district court did not detect or address so well-hidden a claim.  Because we hold that the claim was procedurally barred under state law, in any event, we need not decide whether the claim was properly presented in federal court.

[5]Possibly unnecessarily.  See *Mills v. Singletary,* 606 So.2d 622, 623 (Fla.1992) (holding a failure-to-reweigh claim barred in part for failure to present it in Rule 3.850 motion).

**4**

habeas corpus before the Florida Supreme Court.  Because King failed to do so, the claim is procedurally barred.  *See Teague v. Lane,* 489 U.S. 288, 297-99, 109 S.Ct. 1060, 1068-69, 103 L.Ed.2d 334 (1989).

B.      *Batson* Claim

This claim, on the other hand, is properly presented, having been raised and rejected on direct appeal to the Florida Supreme Court.  But it fails on the merits.

The venire for King's resentencing included three blacks.  Both sides accepted the first to come up for peremptory strikes, Jermima McBride.  The State exercised a peremptory strike, however, against the next black to come up, a minister and school-bus driver named Robert Coleman.  King immediately objected to Coleman's exclusion, relying on a Florida case, *Neil v. State,*[6] that anticipated the holding in *Batson* by two years.  (*Neil* held that if the defendant shows a "strong likelihood" that the prosecution has struck prospective jurors solely because of their race, the prosecution must demonstrate that the reasons for the strike were race-neutral; if the defendant does not meet its initial burden, no inquiry into the State's motives may be made at all.  *See Neil,* 457 So.2d at 486-87.)  The trial court denied this objection without asking the State to articulate a reason for excluding Coleman because it found no "systematic exclusion" of black persons from the jury.  (Dir.App. R.7 at 1139.)

Shortly thereafter, questioning began for the third black venireperson, a St. Petersburg Police Department typist named Mary Ann Brinson.  Brinson was questioned first by the State, and then by the defense.  Brinson vacillated as to whether she could follow the court's instructions.  First, she denied such an ability:

> MS. MCKEOWN [the prosecutrix]:  If the Judge asked you to set aside your personal feelings, follow the law, you could or could not do that?
>
> MISS BRINSON:  I don't think so.
>
> MS. MCKEOWN:  Okay. Have you ever been a juror before?

---

[6] 457 So.2d 481 (Fla.1984).

MISS BRINSON: Yes, I have.

MS. MCKEOWN: On a criminal or civil case?

MISS BRINSON: It was armed robbery.

MS. MCKEOWN: That is obviously a criminal case. Was that while you were with the St. Pete P.D. or prior to—

MISS BRINSON: Just after I first started working there. Maybe a year or less.

MS. MCKEOWN: Obviously the prosecutors and defense lawyers were probably asking the same type questions about setting aside personal feelings, following the law. Do you think your feelings have so changed after being there seven more years with St. Pete you would be unable to do at this juncture—I presume if you were a juror before you were able to set aside personal feelings and follow the law.

      Okay. Do you feel you could do that this time?

MISS BRINSON: No, I don't think so.

(Dir.App. R.7 at 1146-47.) With some later coaxing from defense counsel, however, she changed her mind:

MR. HARRISON [King's counsel]: You indicated that you had—you were currently working for the police department and your experience on the police department might tend to make you a little partial towards the State; is that correct?

MRS. BRINSON:[7] It might.

MR. HARRISON: Pardon?

MRS. BRINSON: It might.

MR. HARRISON: It just might, but, ma'am, when you are working for a law enforcement agency certainly you realize the importance of following our rules and regulations of the Court. You certainly believe in that, don't you?

MRS. BRINSON: Yes, sir.

MR. HARRISON: Pardon?

MRS. BRINSON: Yes.

---

[7]The court reporter apparently corrected Brinson's title ("Miss" to "Mrs.") after King's counsel established that Brinson was married.

MR. HARRISON: You do? And, therefore, if His Honor instructed you on the law in this case, you would follow it, wouldn't you?

MRS. BRINSON: I would have to if the Judge told me to, yes, sir.

(Dir.App. R.8 at 1199-1200.) Under still further point-blank questioning by the court, she echoed her obligation (if not her ability) to follow the law. For the first time, too, she was asked about her death-penalty views, and she equivocated:

THE COURT: Mrs. Brinson, if I may address one or two questions to you, you indicated you would be able to follow the law as the Court would instruct you on the law, Mrs. Brinson; is that correct?

MRS. BRINSON: Pardon? I would have to, Your Honor.

THE COURT: Okay. You did not indicate and I believe counsel didn't ask you your views on the death penalty. Do you have any views with regard to the death penalty?

MRS. BRINSON: It comes down to the death penalty if a man goes out and kills fifteen people, he gets life in prison. One person goes out and kills one person and they get the electric chair. Now, where do you draw the line at? I'm in the middle, I guess you could say.

THE COURT: Let me ask you, do you feel there are certain cases where it would be appropriate, other cases where it would not?

MRS. BRINSON: It would have to be like that.

THE COURT: All right. You have strong feelings one way or the other, either pro or against?

MRS. BRINSON: I guess I'm in the middle.

(Dir.App. R.8 at 1204-05.)

During the next sidebar, the State excused Brinson, and King objected. This time, the court deemed it "appropriate" to ask the State to articulate reasons for its decision to strike Brinson. (*Id.* at 1208.) The State offered two reasons, one racial and one not. The court then overruled King's objection:

MS. MCKEOWN: Okay. She is a young black female[;] the Defendant is a young black male. Her response to the Court's inquiry with regard to her feelings about the death penalty we felt were sufficient for us to have concern about how she would apply the law.

MR. HARRISON: Your Honor, I think that the State has said it better than I could. Miss McKeown wants to excuse the lady in part because of her race, because she is black. She has said that and that is not a[c]onstitutional reason to exclude someone.

**7**

Now, there is a Constitute [*sic* ] in Florida against age discrimination. I don't think it is proper to exclude someone because of their age, relative age. Mr. King is entitled to a jury of his peers, so since he is young and black, Mrs. McKeown is saying you can excuse all young black people from this jury, at least 66 percent of them. I think we are getting in a very dangerous crossroad here and I am concerned. Under State versus Ne[i]l, I would ask that you not allow the State to peremptorially [*sic* ] challenge the lady.

MR. SANDEFER [second prosecutor]: Miss McKeown and I are working on this together. And we agreed, although we didn't discuss our reasons for it in very much detail[,] to excuse her. My problem that I had with this lady was she originally said she could not follow the law. She then indicated later she could. That caused me some concern. Then she threw up a situation where she said in my reading of the death penalty it is not appropriate for somebody who killed one person. That caused me concern.

Apparently she feels like there has to be past murders involved. Obviously we don't have that. I have concern over her being able to follow the law because of the changes in what she said and the final statement about the death penalty.

THE COURT: What she said, as far as my recollection is, that some defendant who killed 15 people get[s] life imprisonment and another defendant who kills one person [is] given the death penalty. She is indicating the law is not evenly followed in all cases.

MR. SANDEFER: That is correct, and that is our concern.

THE COURT: She said that.

MS. MCKEOWN: Judge, I would be less than candid if I didn't state the other—I plan on being honest with the Court. I think it is whether or not the sole basis for exclusion is race, and that is certainly not the sole basis for excluding that lady. And, as I think the Court recognizes, we have accepted, do intend to plan on accepting Mrs. McBride who is another young black female on that jury.

MR. HARRISON: Well, Your Honor, I think we have made our position clear. I think that the State has failed the Ne[i]l versus State test. They want to exclude a person because of their race, at least in part, and I think what Sandefer is doing is coming up with excuses to try to reinforce.

MR. SANDEFER: I'm not going to stand for that, no, sir. That is not—that is exactly my reason.

THE COURT: I'll make a ruling. I think her statement with regard to uneven imposing of the death penalty is certainly more than sufficient justification for excusing her. Overrule the objection.

(Dir.App. R.8 at 1209-12.) King attacks these two rulings on his *Batson* objections on three grounds, which we reject in turn.

*1. Burden-Shifting as to Coleman.*—King first argues that he had established an inference that the prosecutor excluded Coleman because of his race, accordingly requiring the court to demand from the State

**8**

a race-neutral explanation. *See Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). Whether a defendant has thus made a prima facie showing is (perhaps counterintuitively) treated as a question of fact to be decided by the trial judge.[8] Because the state trial court concluded that King had not made a prima facie showing, the first issue here is whether that ruling deserves deference. Under the pre-1996 version of § 2254, state-court findings of fact generally control, but there is an exception if "the merits of the factual dispute were not resolved in the State court hearing." 28 U.S.C. § 2254(d)(1) (1988). That exception applies here. The state trial court simply did not decide whether King made a prima facie showing under *Batson.* Rather, the trial court decided (since the hearing was pre-*Batson* ) that King had not made a prima facie showing under *Neil v. State. Neil* 's standard for a prima facie case, however, is higher than *Batson* 's: *Neil* requires the party opposing a strike to point to facts establishing a "strong likelihood" that the strike had racial motives. 457 So.2d at 486-87. *Batson,* on the other hand, requires the party merely to "raise an inference" of improper motive. 476 U.S. at 96, 106 S.Ct. at 1723. The trial court did not determine whether the more relaxed standard of *Batson* required the State to explain its strikes; on direct appeal, the Florida Supreme Court did not discuss Coleman's exclusion at all. We thus have no on-point state-court finding to defer to.

Nor, as it turns out, do we have the benefit of a finding from the district court. The district court concluded as to Coleman only that King had not established a pattern of discriminatory strikes. But a pattern of strikes is only one fact that could imply a discriminatory motive. *See United States v. Blackman,* 66 F.3d 1572, 1575 (11th Cir.1995). The district court did not find whether all the circumstances here amount to a prima facie showing.

---

[8]*See United States v. Dennis,* 804 F.2d 1208, 1210 n. 22 (11th Cir.1986) ("The Supreme Court in *Batson* clearly contemplated that the determination of whether a prima facie case ... has been made out will ordinarily ... be made in the first instance by the trial court. A remand to the trial court to make such a determination in this case, however, is unnecessary, as a finding by the trial court on this record that appellant has presented evidence sufficient to raise an inference of purposeful discrimination would constitute reversible error despite the 'great deference' that we must accord the trial court's findings in that regard.")

A remand for a finding could be in order. A remand is unnecessary here, however, because the district court could not find an inference of discrimination on this record without clearly erring.[9] *Cf. United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990); *United States v. Dennis,* 804 F.2d 1208, 1210 n. 22 (11th Cir.1986) (both declining to remand a *Batson*-related fact-issue because the record permitted only one finding). The points of evidence that King could point out to create an inference of discrimination are two: first, that Coleman testified that he could follow the law, even regarding the imposition of the death penalty; and second, that Coleman is black. An inability to follow the law—such as that engendered by disagreement with the present death penalty—disqualifies a juror to serve in Florida. *See Sanchez-Velasco v. State,* 570 So.2d 908, 915-16 (Fla.1990). In essence, therefore, King would have us conclude that the mere striking of a qualified black juror raises an inference of race discrimination. We have found no case so concluding.

There is no need here, moreover, to decide that King's two points will never be enough, because there is evidence in the record that undermines any discriminatory inference. First, the State rejected Coleman just a few pages of transcript after accepting another black venireperson; not only was there no pattern of discriminatory strikes, there was a sort of "antipattern." Furthermore, while we do not intend to speculate about the State's motives for striking Coleman, Coleman's profession was an important circumstance undermining any inference of discrimination. He was a minister, and in fact he was in the process of establishing a prison ministry. In various pretrial filings, King's counsel had identified prison ministers as witnesses to King's good character. (*See, e.g.,* Dir.App. R.1 at 67, 156.) These circumstances would obviously diminish Coleman's desirability as a juror. Perhaps because of all these facts, King's counsel acknowledged that "I certainly don't infer any ill motive." (Dir.App. R.7 at 1139.) The only proper finding

---

[9]King has waived the right to present further evidence on his *Batson* claim because he did not seek an evidentiary hearing in state court. *See Keeney v. Tamayo-Reyes,* 504 U.S. 1, 7-12, 112 S.Ct. 1715, 1719-21, 118 L.Ed.2d 318 (1992). The district court would thus have before it exactly the same record that this court has.

is that no inference of discrimination has arisen, and it follows that *Batson* did not oblige the state trial court to inquire into the State's reasons for striking Coleman, or to sustain King's objection.

*2. Finding as to Motive for Striking Brinson.*—Second, King contends that the trial court erred in accepting the State's reasons for striking Brinson. Here, the state-court finding merits deference. The state court's finding as to the State's motives for striking Brinson binds the federal courts unless the finding is not "fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1988). We interpret the state trial court's finding, which was quoted above, to be that the State had mixed motives, but that the nonracial motives—principally Brinson's equivocation on her death-penalty views—independently sufficed to exclude her. This finding has fair record support.

First, the prosecution could reasonably have worried about Brinson's views. Even though the court's questioning elicited the response only that Brinson was "in the middle" on the death penalty, (Dir.App. R.8 at 1205)—an answer that might by itself seem innocuous—Brinson had earlier denied an ability to follow the law, which made any error in her understanding of death penalty standards that much riskier. And there was reason to think her death-penalty notions erred; as the State said, one could infer from her statement a belief that multiple murders were necessary for death to be appropriate. Second, the court could reasonably see race as a weak factor here. After all, even though the State admitted that race figured into its decision to excuse Brinson, it had accepted one of the other two black persons in the venire. Taken together, these two points are enough to command deference to the state court's finding that nonracial motives sufficed to assure a strike, even if motives were mixed.

Once we defer to that state-court finding, we must conclude that King is not entitled to relief. When the motives for striking a prospective juror are both racial and legitimate, *Batson* error arises only if the legitimate reasons were not in themselves sufficient reason for striking the juror. *See Wallace v. Morrison,* 87 F.3d 1271, 1274 (11th Cir.1996).

*3. Failure to Revisit Coleman Strike After Striking of Brinson.*—According to King, once the State had exercised a peremptory strike against Brinson, the trial court should have reconsidered its earlier ruling on Coleman. King cites no authority in support of his argument, and we decline to conclude that *Batson* requires a court to follow this course. One principal reason supports this holding.

By failing to timely object, a defendant waives his right to challenge racially motivated strikes. This is true in the Florida courts where the trial occurred, *see State v. Castillo,* 486 So.2d 565, 565 (Fla.1986), and states may have such procedural requirements consistent with the Constitution. *See Ford v. Georgia,* 498 U.S. 411, 423, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991) ("Undoubtedly ... a state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected."). Indeed, an analogous procedural rule exists in the federal courts. *See, e.g., United States v. Ratcliff,* 806 F.2d 1253, 1256 (5th Cir.1986). A necessary corollary to a default rule is the principle that the trial court has no duty to police peremptory strikes sua sponte. *See Davis v. Baltimore Gas & Elec. Co.,* 160 F.3d 1023, 1028 (4th Cir.1998). To reach King's desired result, we would have to deem the trial court bound by just such a duty: once the court had ruled upon King's earlier objection to Coleman's dismissal, there was no motion pending for the court to consider. We thus reject King's argument as inconsistent with the default rule.

### III. Conclusion

For the foregoing reasons, we affirm the district court's denial of relief.[10]

---

[10]King's other four claims that we do not discuss in the text are (1) that resentencing counsel was unconstitutionally ineffective, for several reasons—(a) failing adequately to investigate, develop, and present King's mental-health and substance-abuse history, (b) failing to present evidence of King's intoxication on the night of the crimes, (c) acceding to prosecutorial remarks that burdened King with proving that mitigating circumstances outweighed aggravating ones, and (d) failing to present evidence that the victim was unconscious during her murder; (2) that King received ineffective mental-health assistance because his psychiatric experts were not adequately prepared to diagnose his mental problems; (3) that the jury instructions did not adequately direct the jury's sentencing discretion; and (4) that the prosecution and court unconstitutionally minimized the jury's sentencing responsibility, in violation of the Eighth Amendment doctrine enunciated in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

AFFIRMED.

## *APPENDIX*

*CLAIM I*

*Espinosa v. Florida* establishes that Mr. King's death sentence was the product of constitutionally invalid jury instructions and the improper application of statutory aggravating circumstances in violation of his Eighth and Fourteenth Amendment rights.

*CLAIM II*

Despite defense counsel's objections and requests that the jury be accurately and completely instructed, Mr. King's sentencing jury was repeatedly misinformed and misled by instructions and arguments

APPENDIX—Continued

which unconstitutionally and inaccurately diluted their sense of responsibility for sentencing, in violation of the Eighth and Fourteenth Amendments.

*CLAIM III*

---

Subparts (a) and (b) of the first argument stumble on state-court findings, made after a hearing, that the evidence presented at King's resentencing hearing was chosen for reasonable strategic reasons; that finding has record support, the strategy was reasonable, and King thus cannot satisfy the deficient-performance prong of *Strickland v. Washington,* 466 U.S. 668, 678, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). King cannot show the necessary prejudice on subpart (c) because the jury was instructed according to Florida law. *See Gamble v. State,* 659 So.2d 242, 246 (Fla.1995). Subpart (d) is procedurally defaulted for failure to present it in state postconviction proceedings.

The second claim asserted here is subsumed within the first, *see Bryan v. Singletary,* 140 F.3d 1354, 1361 n. 13 (11th Cir.1998), and it is meritless for the same reasons. The third claim is procedurally barred; the Florida Supreme Court so concluded in the Rule 3.850 appeal as to the parts of this argument presented to it, and the parts not presented in the Rule 3.850 petition are barred for failure to do so. *See King v. State,* 597 So.2d 780, 781 & n. 1 (Fla.1992). (Even if this claim, based on *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), were not defaulted, the nonretroactivity doctrine would bar relief. *See Lambrix v. Singletary,* 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).) Finally, the *Caldwell* claim is procedurally barred, as the Rule 3.850 and state habeas corpus courts concluded, because King did not raise it on direct appeal. *See King v. State,* 597 So.2d 780, 780 n. 1 (Fla.1992). We agree with the Florida Supreme Court, furthermore, that King's appellate counsel was not constitutionally ineffective for failing to raise this argument on direct appeal, and the default thus remains unexcused. *See King v. Dugger,* 555 So.2d 355, 357-58 (Fla.1990).

**13**

The trial court erred in allowing the state to unconstitutionally exclude black people from the jury panel by the exercise of peremptory challenges.

*CLAIM IV*

Mr. King was deprived of the effective assistance of counsel, in violation of the Sixth, Eighth, and Fourteenth Amendments. Mr. Davis was denied effective representation of counsel during penalty phase thereby denying his Sixth, Eighth, and Fourteenth Amendment rights. Counsel failed to investigate, develop, and present mitigating evidence, to death qualify the jury, to object to improper prosecutorial conduct and insure an individualized sentencing.

*CLAIM V*

Mr. King was denied due process when critical mental health evidence, never reached the judge and jury due to inadequacies in the pretrial experts' evaluations and ineffective assistance of counsel, in contravention of the Sixth, Eighth, and Fourteenth Amendments.

*CLAIM VI*

The resentencing court relied on non-record "evidence", evidence which Mr. King had no opportunity to rebut, without any notice to Mr. King that such "evidence" would be considered, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

APPENDIX—Continued

*CLAIM VII*

Mr. King's sentencing jury was instructed that the alternative to a penalty of death was life imprisonment without possibility of parole for twenty years, contrary to state law and in violation of the Sixth, Eighth, and Fourteenth Amendments. This error was aggravated further by the sentencing court's refusal to allow accurate evidence and to provide the jury with instructions regarding the consequences of their verdict, undermining Mr. King's right to an individualized and reliable capital sentencing determination in contravention of the Sixth, Eighth, and Fourteenth Amendments.

*CLAIM VIII*

The trial court violated the Sixth and Eighth Amendments when it precluded Mr. King from presenting, and the jury from considering, evidence establishing mitigating circumstances and rebutting aggravating circumstances, and limited Mr. King's ability to cross-examine state witnesses in derogation of Mr. King's rights to an individualized and reliable capital sentencing determination and to the effective assistance of counsel.

*CLAIM IX*

Mr. King was denied the effective assistance of counsel at the guilt-innocence phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Execution of Mr. King in light of newly discovered evidence of innocence would violate the Eighth and Fourteenth Amendments.

### CLAIM X

The finding of the aggravating factor of heinous, atrocious and cruel violated the

APPENDIX—Continued

Eighth Amendment, *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), because no rational factfinder could find the elements of this aggravator proven beyond a reasonable doubt.

### CLAIM XI

The trial court's refusal to excuse for cause jurors who had expressed a clear and unequivocal bias in favor of the imposition of a sentence of death deprived Mr. King of his right to a fair and impartial jury, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### CLAIM XII

The introduction of nonstatutory aggravating factors so perverted the sentencing phase of Mr. King's trial that it resulted in the arbitrary and capricious imposition of the death penalty, in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

### CLAIM XIII

The trial court's error in dismissing certain jurors for cause deprived Mr. King of his rights in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and *Witherspoon v. Illinois.* Mr. King received ineffective assistance of counsel when counsel failed to

APPENDIX—Continued

advocate and litigate this issue, in violation of Mr. King's rights under the Fifth, Sixth, Eighth, and Fourteenth

Amendments.

### CLAIM XIV [numbered as XV]

The trial court's admission of unconfrontable, unrebuttable rank hearsay at Mr. King's sentencing proceeding violated his fundamental constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.

### CLAIM XV

The trial court's unconstitutional shifting of the burden of proof in its instructions at sentencing and its application of this same improper standard in imposing sentence, as well as the state and defense counsel's arguing that Mr. King had the burden of proving that death was an inappropriate sentence, deprived Mr. King of his rights to due process and equal protection of law, as well as his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

## CLAIM XVI

Mr. King's sentence of death was rendered fundamentally unreliable and unfair by the resentencing court's refusal to find mitigation which had been in fact found by the original sentencing court, and affirmed on the original appeal, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.