808 So.2d 1237 (2002)
Amos Lee KING, Appellant,
v.
STATE of Florida, Appellee.
Amos Lee King, Petitioner,
v.
Michael W. Moore, etc., Respondent.
Nos. SC02-01, SC02-02.
Supreme Court of Florida.
January 16, 2002.
*1238 Bill Jennings, Capital Collateral Regional Counsel-Middle, Richard E. Kiley, Assistant CCC, and April E. Haughey, Assistant CCC, Tampa, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar and Stephen D. Ake, Assistant Attorneys General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Amos Lee King, a prisoner under sentence of death and an active death warrant, has filed in this Court a successive petition for writ of habeas corpus and motions seeking a stay of execution. King also appeals an order of the circuit court denying a successive motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. We deny the successive petition for writ of habeas corpus and affirm the trial court's denial of the successive 3.851 motion. We also deny King's separate request to stay his execution while he *1239 seeks an application for a writ of certiorari from the United States Supreme Court.[1]

BACKGROUND
The facts of this case are set forth in our initial opinion on direct appeal, in which we affirmed King's first-degree murder conviction and death sentence for the murder of Natalie Brady. See King v. State, 390 So.2d 315, 316-17 (Fla.1980), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981).
In 1981, King instituted his first rule 3.850 motion for postconviction relief, and then Governor Bob Graham signed King's first death warrant. This Court affirmed the trial court's denial of the 3.850 motion and denied King's request for a stay of execution. See King v. State, 407 So.2d 904, 905 (Fla.1981). While King's postconviction relief appeal was pending before this Court, King petitioned for federal habeas corpus relief. The United States District Court for the Middle District of Florida granted a stay of execution but, in an unpublished decision, later vacated that stay when it denied King's federal habeas petition.
On appeal of the district court's denial, the Eleventh Circuit Court of Appeals denied King the requested habeas relief with regard to his convictions but granted relief as to the death sentence. See King v. Strickland, 714 F.2d 1481, 1495 (11th Cir. 1983). The United States Supreme Court vacated the Eleventh Circuit's opinion and remanded to the Eleventh Circuit for reconsideration in light of the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Strickland v. King, 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984). On remand, the Eleventh Circuit applied Strickland and again vacated King's death sentence, finding that King's trial counsel was ineffective during the penalty phase. See King v. Strickland, 748 F.2d 1462, 1465 (11th Cir.1984), cert. denied, 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). The court reinstated its prior opinion as to all other issues previously decided. See id.
After conducting new penalty proceedings, the trial court followed the jury's unanimous recommendation and again imposed a sentence of death upon King. The trial court found five aggravators[2] and no mitigators. This Court affirmed the death sentence on direct appeal but struck the aggravator of a great risk of death to many persons. See King v. State, 514 So.2d 354, 360 (Fla.1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Then Governor Bob Martinez signed King's next death warrant in October 1988, setting King's execution for 7 a.m. on November 30, 1988. King filed a 3.850 motion with the trial court on November 28, 1988. The trial court summarily denied the motion that day. King appealed to this Court the circuit court's *1240 3.850 denial, petitioned for a writ of habeas corpus, and requested a stay of execution. In an unpublished order on November 29, 1988, we granted the stay of execution and remanded the 3.850 motion to the trial court for its further consideration. See King v. State, 538 So.2d 1255 (Fla.1988) (table). On remand after an evidentiary hearing, the trial court denied King's rule 3.850 motion. We affirmed that denial on appeal. See King v. State, 597 So.2d 780 (Fla.1992). We also denied King's petition for writ of habeas corpus. See King v. Dugger, 555 So.2d 355 (Fla.1990).
In 1992, King filed a habeas corpus petition in the federal district court. In a 1998 unpublished decision, the district court denied the habeas petition. The Eleventh Circuit affirmed the district court's denial of relief, see King v. Moore, 196 F.3d 1327 (11th Cir.1999), and the Supreme Court denied King's petition for certiorari. See King v. Moore, 531 U.S. 1039, 121 S.Ct. 631, 148 L.Ed.2d 539 (2000).
While he sought relief in the federal system, King instituted several more post-conviction motions in the state system. King filed a pro se habeas corpus petition in this Court on February 7, 1997, which we denied without opinion. See King v. Singletary, 695 So.2d 700 (Fla.1997) (table). On January 24, 1997, King filed a pro se motion for postconviction relief and habeas corpus petition in the trial court, which the trial court dismissed without prejudice. King refiled those identical papers in the trial court on February 3, 2000, but withdrew them on October 26, 2000. On October 3, 2001, King filed another pro se motion for postconviction relief in the trial court.

DEATH WARRANT PROCEEDINGS
On November 19, 2001, Governor Jeb Bush signed King's third death warrant, the second after resentencing. Execution was set for 6 p.m. on Thursday, January 24, 2002. The trial court held a case management conference on November 21, 2001, and established a schedule governing all further proceedings before the trial court pending the resolution of the status of the Capital Collateral CounselMiddle's (CCRC-M) representation of King. The case management order included filing deadline dates for public records requests and pleadings and established tentative dates for further hearings if needed. At a November 29, 2001, hearing, King withdrew a separately filed pro se motion to dismiss CCRC-M as counsel and stated that he wanted CCRC-M as his counsel. The trial court then struck King's October 3, 2001, pro se postconviction motion because King was represented by CCRC-M.
Thereafter, CCRC-M filed additional public record requests with six agencies and sought DNA testing of vaginal washings and a rectal swab taken from the murder victim, Natalie Brady. Pursuant to section 925.11, Florida Statutes (2001), and Florida Rule of Criminal Procedure 3.853, the trial court found the DNA request to be sufficient and ordered the State to respond. The State responded with a copy of a report generated by the Office of the State Attorney for the Sixth Judicial Circuit which was prepared during the summer of 2001, anticipating the October 1, 2001, effective date of section 925.11. That report concluded that the vaginal washings and rectal swab no longer existed and therefore could not be tested.
The trial court held a hearing on December 10, 2001, regarding the public records and DNA requests. At this hearing, the trial court accepted testimony from Debra Lewis, the Records Custodian, and Larry Bedore, the Director of Operations *1241 for the Pinellas County Medical Examiner's Office.[3] The trial court also accepted testimony from Lieutenant Wallace Colcord, the Technical Services Supervisor, and Linda Johansen, an attorney for the Pinellas County Sheriffs Office. After the December 10 hearing, the trial court dismissed King's motion for DNA testing because the trial court ruled that the forensic evidence (i.e., the vaginal washings and rectal swab) no longer existed and therefore could not be tested.
Subsequently, on December 18, 2001, King filed a successive 3.851 motion and raised eight claims for relief. The State responded to the 3.851 motion on December 20, 2001. On December 21, 2001, the trial court held a hearing pursuant to Huff v. State, 622 So.2d 982, 983 (Fla.1993), at which all parties agreed there was no need for a further evidentiary hearing. The trial court entered an order on January 1, 2002, denying all relief. King appeals the denial of his 3.851 motion and raises eight claims.[4] King raises eleven separate claims in his habeas petition.[5]
During the pendency of the proceedings before this Court, King filed in the trial court a motion seeking the release of evidence for DNA testing. In that motion, King sought mitochondrial DNA (mtDNA) testing of the hair fragment found on Brady's nightgown and three hairs obtained in the pubic hair combing of Brady. King also sought testing using the Short Tandum Repeat Typing DNA (STR DNA) method from an independent laboratory of the fingernail scrapings taken from Brady.[6] *1242 King also sought the release and testing of the known standard samples for King and Brady. After a hearing on January 8, 2002, the trial court denied King's motion. King filed an amended motion, and the trial court ordered the State to respond. After accepting further arguments at a hearing on January 11, 2002, the trial court, on January 13, 2002, denied the amended motion. King appealed the trial court's ruling.

SUCCESSIVE 3.851 MOTION
King's first contention is that the trial court erred in concluding that there was no bad faith on the part of the State regarding the destruction of the vaginal washings and rectal swab. The trial court wrote:
This court has read the entire state's DNA report and the entire transcript of the December 10, 2001 hearing. After doing so, this court makes the following findings: 1. That the vaginal washings and the rectal swabs were destroyed by someone in the medical examiner's office, either immediately after they were tested, or within one to two years after they were taken, as was customary in all cases where such specimens were obtained and tested in house, as was done in this case. 2. There was no knowledge of DNA testing in 1977, 1978, or 1979. 3. No one connected to the medical examiner's office, the sheriff's office, or the state attorney's office could have known when these specimen's were obtained or destroyed that they might someday be scrutinized for DNA, to either include Mr. King as the secretor in the vaginal washings, or to exclude him.
After making the above factual findings, it is apparent that Mr. King cannot be given any relief requested as to Claim I. The landmark case of Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and all cases since, requires a defendant to show bad faith on the part of the person destroying the evidence before any relief can be afforded.
"But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.... We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."

Arizona v. Youngblood, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).
... In 1977-1979, no one knew that DNA matching would become the forensic tool for identification that it has become. Thus, the state, through the medical examiner, could not have known at the time the washings, and the swab were destroyed that they would ever be of any benefit to the defense for DNA testing. Thus, the defendant cannot show that the state, through the medical examiner's office, made a "conscious effort to prevent the defense from securing the evidence."
The defendant cannot show bad faith on the part of the Pinellas County Medical Examiner's Office when someone, presumably Dr. Wood, the Assistant Medical Examiner at the time, destroyed the washings and swab. Before *1243 1981, Florida Statute 406.13 (1973) did not even require the medical examiner's office to maintain such specimens for any length of time. It merely provided that "any evidence or specimen coming into the possession of said medical examiner in connection with any investigation or autopsy may be retained by him or be delivered to one of the law enforcement officers assigned to the investigation of the death." F.S. [§]406.13 (1973) (emphasis mine). It was only when the Administrative Code was amended in 1981 that the requirement that the type specimens involved here "shall be retained for one year, and afterwards at the discretion of the medical examiners" (emphasis mine) was included. The 1981 Amendment to the Administrative Code is still in effect today. See Fla. Admin. Code Ann. R. 11G-2.004(1)(h) and (4)(b) (2001); F.S. § 406.13 (2001). Thus, even today, the medical examiner could destroy a specimen such as a vaginal washing or rectal swab after one year. In this case, which occurred in 1977, whether the vaginal washing and swab were destroyed immediately after they were tested for blood types, or whether they were retained for one or two years before they were destroyed, they were not destroyed contrary to any law in existence, the medical examiner had no reason to believe the specimen could ever be of any use to exonerate Mr. King in the future, they were not destroyed contrary to any existing policy that existed at the Sixth Circuit Medical Examiner's Office, and in sum, nothing about the destruction of either the vaginal washing or the rectal swabs shows any required bad faith on the part of the medical examiner, and thus, the state. Without a showing of bad faith, the defendant simply cannot prevail.
State v. King, Nos. 77-02173CANOO & 77-01696CFANO, order at 11-12 (Fla. 6th Cir. Ct. order filed Jan. 1, 2002).
We find competent, substantial evidence in the record which supports the trial court's factual findings. We find no error with the trial court's application of Youngblood that King has failed to demonstrate bad faith on behalf of the State. See Youngblood, 488 U.S. at 58, 109 S.Ct. 333.[7]
*1244 King's second contention is that his trial counsel was ineffective for failing to preserve forensic evidence. The trial court ruled:
The short answer to this claim is that it is procedurally barred. Ineffective assistance of counsel at both the guilt-innocence phase and at the sentencing phase was previously litigated at the trial court where an evidentiary hearing was held in 1981, and co-counsel and another experienced defense attorney testified about counsel, Tom Cole's, who was then deceased, deficiencies. The trial court denied relief on this claim. This claim was appealed to the Florida Supreme Court, and they denied relief. King v. State, 407 So.2d 904 (Fla.1981). A habeas petition was taken to the Middle District of Florida raising ineffective assistance of counsel. The Honorable William J. Castagna denied relief on this claim. This decision was appealed to the Eleventh Circuit, which denied the defendant's ineffective assistance of counsel claim at the guilt-innocence phase, but granted relief as to the claimed ineffective assistance of counsel at the penalty phase. King v. Strickland, 714 F.2d 1481 (11th Cir.1983). The Eleventh Circuit reviewed their decision again in accordance with the United States Supreme Court's then recent case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and arrived at the same decision. King v. Strickland, 748 F.2d 1462 (11th Cir.1984).
In 1992, the defendant filed another habeas petition in the Middle District of Florida. One of the claims raised was Claim IX, "Mr. King was denied the effective assistance of counsel at the guilt-innocence phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Execution of Mr. King in light of newly discovered evidence of innocence would violate the Eighth and Fourteenth Amendments." Middle District Judge Susan C. Bucklew denied defendant's claims, including Claim IX in a 96-page memorandum, unpublished opinion. The defendant appealed this denial of his habeas petition to the Eleventh Circuit, which didn't discuss this claim, but only listed it as one of the Claims dealt with by the Middle District Judge. King v. Moore, 196 F.3d 1327, 1337 (11th Cir.1999).
State v. King, order at 13-14. We agree with the trial court that this claim is procedurally barred.
King's third contention is that trial counsel was ineffective for counsel's failure to adequately conduct voir dire. The trial court ruled:
This claim is procedurally barred. In addition, defendant failed to comply with [Florida Rule of Criminal Procedure] 3.851(e)(2)(B), which requires a successive motion to state the reason any claim was not raised previously. If the reason is that the complained of information, that Mrs. Demuth's father was a law enforcement officer, was uncovered by a reporter for the St. Petersburg Times in 1996, there is still no reason given why this could not have been uncovered by exercising due diligence by collateral counsel. Additionally, Mr. Cole and Mr. Rondolino, defendant's trial counsel, may have known this. As this court suggested at the hearing, there has always been a place on the juror questionnaires, which are provided to counsel in every case, that asks if the juror is related to any one in law enforcement. (T. 46-47, Hearing 12/21/01). For all we know, Mrs. Demuth answered that question "yes," and as the state suggests in their response to defendant's 3.851 motion, defendant's attorneys were "satisfied to have Demuth, a mother of four *1245 children still at home and a substitute elementary teacher, on the panel."
Additionally, there is no suggestion that the defendant suffered any prejudice because Mrs. Demuth, or any other juror was on his panel. The state's evidence, although circumstantial, was strong enough for the jury in Mr. King's trial to unanimously vote for guilty as charged. There is no suggestion, nor could there be, that another jury would have found differently. Thus, the defendant cannot show the required prejudice to succeed in this claim.
State v. King, order at 16. We agree with the trial court's determination of this issue.
King's fourth contention is that King is "actually innocent of first-degree murder and felony murder and of the death penalty." The trial court ruled:
King has presented no "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at his first trial," thus, there is no "new reliable evidence" that can give Mr. King relief on this claim.
The evidence used to convict King at his trial in 1977 may have been circumstantial, but not one shred of it has changed in 24 years, and he has presented no new evidence, except his claim on the vaginal washings, which is sheer speculation as to whether or not if they were available to be tested, and could be tested, the result would even be exculpatory. The washings might, as the state had hoped, have produced the final damning blow to Mr. King. The only real thing which exists to show "actual innocence" is Mr. King's saying it is so, and this is neither new nor sufficient for relief to be granted.
State v. King, order at 19.
We agree with the trial court's determination of this issue, and we find that this issue is procedurally barred. See Jones v. State, 709 So.2d 512, 520 n. 6 (Fla.1998) (finding procedural bar to claim of newly discovered evidence where claim not timely presented); see also Mills v. State, 786 So.2d 547, 549-50 (Fla.2001).
In contention five, King argues that his initial postconviction counsel was ineffective. The trial court commented:
[T]his claim must fail because both Florida law and the Federal law makes clear that a defendant has no constitutional right to effective collateral counsel. The Florida Supreme Court says, "However, claims of ineffective assistance of postconviction counsel do not present a valid basis for relief." Lambrix v. State, 698 So.2d 247, 248 (Fla.1997). In Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Supreme Court refused to extend a due process requirement for effective collateral counsel to situations where a state, like Florida, has opted to afford collateral counsel to indigent inmates.
State v. King, order at 21.
We agree with the trial court that King's contention fails because his claim does not state a valid basis for relief. See Murray v. Giarratano, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989); Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); Lambrix v. State, 698 So.2d 247 (Fla.1996), not followed on other grounds, Williams v. State, 777 So.2d 947 (Fla.2000). For this same reason, King's eighth contention fails to state a valid basis for relief.
King's sixth contention, that Apprendi applies to Florida's capital sentencing statute and the maximum sentence under the statute is death, has been decided adversely to King's position. See Mills v. Moore, 786 So.2d 532, 537-38 (Fla.2001), cert. denied, 532 U.S. 1015, 121 S.Ct. 1752, 149 *1246 L.Ed.2d 673 (2001); see also Brown v. Moore, 800 So.2d 223 (Fla.2001) (rejecting claims that aggravating circumstances are required to be charged in indictment, submitted to jury during guilt phase, and found by unanimous jury verdict); Mann v. Moore, 794 So.2d 595, 599 (Fla.2001) (same). We are aware that the United States Supreme Court very recently granted certiorari in State v. Ring, 200 Ariz. 267, 25 P.3d 1139 (2001), cert. granted, ___ U.S. ___, 122 S.Ct. 865, 151 L.Ed.2d 738 (2002); however, we decline to grant a stay of execution following our precedent on this issue, on which the Supreme Court has denied certiorari. Thus, King is not entitled to relief on this issue.
King's remaining claim is meritless and does not require discussion.[8] As King's claims are either procedurally barred or meritless, we affirm the trial court's denial of King's postconviction motion.

SUCCESSIVE PETITION FOR HABEAS CORPUS
Most of King's habeas claims are procedurally barred in this successive habeas corpus petition as those claims should have been raised previously. See Johnson v. Singletary, 647 So.2d 106, 109 (Fla.1994) ("Successive habeas corpus petitions seeking the same relief are not permitted nor can new claims be raised in a second petition when the circumstances upon which they are based were known or should have been known at the time the prior petition was filed.").[9] Claims seven and nine are procedurally barred as they were raised in King's most recent 3.850 motion and are not properly relitigated in this habeas petition. See Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which ... were raised ... in a rule 3.850 motion...."). Claim ten, regarding King's extended stay on death row, is meritless. See Rose v. State, 787 So.2d 786, 805 (Fla.2001) (denying same claim for inmate on death row longer than King), petition for cert. filed, No. 01-7229 (U.S. Oct. 31, 2000); Knight v. State, 746 So.2d 423, 437 (Fla.1998) (time on death row more than twenty years), cert. denied, 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999). Claim eleven, regarding challenges to Florida's clemency process, likewise is meritless. See Provenzano v. State, 739 So.2d 1150, 1155 (Fla.1999); see also Glock v. Moore, 776 So.2d 243, 252-53 (Fla.2001). Therefore, we deny King's successive habeas corpus petition.

REQUEST FOR MITOCHONDRIAL DNA TESTING
King filed in the trial court a motion to release evidence for additional DNA testing on January 7, 2002. In that motion, King sought mtDNA testing of the hair fragment found on Brady's nightgown and three hairs obtained in the pubic hair combing of Brady. King also sought additional and independent testing using the STR DNA method of the fingernail scrapings taken from Brady. The FDLE lab previously had concluded, using the STR *1247 DNA method, that the sample was insufficient for testing purposes. King also sought the release of the known standard samples for King and Brady.
After a hearing on January 8, 2002, the State asserted that King had failed to file a sufficient motion. The trial court denied King's motion, in part because of King's failure to adhere to the procedural requirements of rule 3.853. King filed an amended motion on January 11, 2002, and the trial court ordered the State to respond. After accepting further arguments at a hearing on January 11, 2002, the trial court, on January 13, 2002, denied the amended motion. The trial court ruled:
The court has now had the benefit of the defendants amended motion, the state's response thereto, the hearing held on the original motion on January 8, 2002, and the brief hearing on the amended motion on January 11, 2002. As to the three items sought by the defendant to be re-tested, the court finds as follows:
1. The hair fragment found on Natalie Brady's nightgown: According to the attachment filed with the state's response, this fragment was a body hair, unknown as to where it came from, the arms, the legs, or some other part of the body. It was too small of a fragment to determine if it was Negroid or Caucasian in origin. It was too small a fragment to be microscopically matched to any known samples. When Patrolman Rosario Coniglione, Tarpon Springs Police Department, found Mrs. Brady, she was laying on her back in the porch door threshold area, presumably having crawled from her bedroom, where the fire was started, to that area where she expired. Her nightgown was up over her breast area, and she was naked, except for the nightgown. He and Officer Dawson found her and dragged her out of the burning house, where she was eventually covered with a sheet. Mrs. Brady was examined by the medical examiner preliminarily at the scene, and was identified by two neighbors at the scene. Many other fire and police personnel were at the scene. This hair fragment could have been transferred from any one's hair that was on Mrs. Brady's floor as she crawled from her bedroom to the back door, from any one's hair that was on her porch area where she expired, from any one's hair that was on the ground outside her house where she was dragged away from the fire, from the perpetrator of the rape and murder, from one of the men who dragged her away from the burning house, from the medical examiner, from one of those who identified her, from any other fire or police personnel present, or from Mrs. Brady. Thus, even if this fragment of a body hair could be further re-tested for DNA, and it was determined that it didn't come from Mrs. Brady, or from Mr. King, this court cannot make the required finding under the statute or the rule, that there exists a reasonable probability that the defendant would be acquitted, or that he would receive a life sentence if the requested re-testing were allowed. Fla. Stat. § 925.11(2)(f)3; Fla. R.Crim. P. 3.853(c)(5)(C).
2. The three hairs obtained from the pubic hair combings of the victim: As part of the investigation of this *1248 homicide, pubic hair combings of the victim, Mrs. Brady, were obtained and sent to the FBI lab for analysis. The FBI report says "Specimen Q2 [which is Mrs. Brady's pubic combings] contained three brown pubic hairs of Caucasian origin, two of which are partially charred. The uncharred portions of these hairs and the one hair which is not charred are microscopically like the hairs contained in K2. [K2 is the known pubic hair sample from Mrs. Brady.] In all probability, these hairs originated from the person represented by K2." See FBI Report, p. 3, attached as Exhibit A. It is clear that the three pubic hairs from the pubic combings from Mrs. Brady are Mrs. Brady's pubic hairs. This is no surprise. This is what you expect from pubic combings from any person their own pubic hairs. Occasionally, there may be a pubic hair from the perpetrator of a rape in a rape victim's pubic hair combings. But not in this case. All three pubic hairs from the combings microscopically matched the known pubic hairs of Mrs. Brady. Since these three pubic hairs originated from the victim, this court cannot make the required finding under the statute or the rule, that there exists a reasonable probability that the defendant would be acquitted or would receive a life sentence if the requested re-testing were allowed. See Statute and Rule sections in 1., above.
3. The fingernail scrapings taken from the victim: The defendant admits in his motion that, unlike the hairs, there is not another method of DNA testing of these fingernail scrapings. The only method of testing fingernail scrapings is that which was used by the Florida Department of Law Enforcement (FDLE) to test the scrapings in this case. The type testing done by the FDLE is called Short Tandum Repeat Typing DNA testing (STR DNA). The defendant merely suggests that the results of the FDLE analysis that there was insufficient material for STR DNA analysis might be wrong. There is no provision in the statute or the rule for re-testing once testing has been done by FDLE. This would be particularly true when, as here, there is no showing that the FDLE test is inaccurate, or there is any other type DNA test that can be done. If re-testing were allowed of the fingernail scrapings in this case, re-testing would have to be allowed for every DNA test performed by FDLE for every defendant who did not like the result obtained by the FDLE test. This is not required, not contemplated, nor appropriate under either the new statute or the new rule.
The defendant has not filed a motion for Postconviction DNA Testing as contemplated by Fla. Stat. § 925.11, or Fla. R.Crim. P. 3.853. The defendant has filed a Postconviction Motion for Additional DNA Testing. There is no statute or rule that requires additional DNA testing. The defendant admits in his motion that all the evidence he wants this court to order re-tested has already been tested for STR DNA by the Florida Department of Law Enforcement. He admits that the results of the DNA testing performed by FDLE were inconclusive because there was insufficient *1249 quality or quantity to perform an STR DNA analysis. Even if there were a provision for re-testing, as to the fingernail scrapings, the defendant has shown no good cause why that specimen should be re-tested by anyone. Assuming the defendant may have shown good cause for a laboratory other than FDLE to retest the pubic hairs, and the body hair fragment, since the FDLE does not conduct mitochondrial DNA analysis, this court, for the reasons stated in 1. and 2. above, cannot make the required finding under the statute or the rule, that there exists a reasonable probability that the defendant would be acquitted or would receive a life sentence if the requested mitochondrial DNA re-testing were allowed. Fla. Stat. § 925.11(2)(f)3; Fla. R.Crim. P. 3.853(c)(5)(C).
State v. King, Nos. 77-02173CANOO & 77-01696CFANO, order at 1-3 (Fla. 6th Cir. Ct. order filed Jan. 13, 2002) (alterations in original).
We find no error in the trial court's determination that King has not made the required showing, pursuant to rule 3.853, for testing the hairs in this case. We likewise approve the trial court's order in respect to the fingernail scrapings for the reasons stated in the trial court's order.

CONCLUSION
We affirm the trial court's denial of King's successive 3.851 motion, deny the successive habeas corpus petition, and deny all pending motions for stay of execution. We also deny King's separate motion for a stay of execution pending his application for a writ of certiorari from the United States Supreme Court.
No motion for rehearing will be allowed.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
QUINCE, J., recused.
NOTES
[1] We commend Circuit Judge Susan F. Schaeffer for her thorough, orderly, and expedited consideration of matters before the trial court. Her orders in this case, especially the case management order and the twenty-seven page order denying postconviction relief, cogently framed the previous history and issues under consideration. See State v. King, Nos. 77-02173CANOO & 77-01696CFANO (Fla. 6th Cir. Ct. orders filed Nov. 26, 2001, nunc pro tunc to Nov. 21, 2001, & Jan. 1, 2002).
[2] The trial court found in aggravation that: (1) the murder was committed while King was under sentence of imprisonment; (2) King had previously been convicted of a violent felony; (3) King knowingly created a great risk of death to many persons by setting fire to the victim's home; (4) the murder was committed while King was engaged in the commission of the crimes of burglary and sexual battery; and (5) the murder was especially wicked, evil, atrocious, or cruel.
[3] The trial court found Dr. Joan Wood to be unavailable due to illness.
[4] King contends that: (1) the trial court erred in concluding that there was no bad faith on the part of the State regarding the destruction of the vaginal washings and rectal swab; (2) trial counsel were ineffective for their failure to investigate and preserve forensic evidence; (3) trial counsel was ineffective for counsel's failure to adequately conduct voir dire; (4) King is "actually innocent of first-degree murder and felony murder and of the death penalty"; (5) King's initial postconviction counsel was ineffective for failure to raise various arguments; (6) Florida's death sentencing statute is unconstitutional as applied in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (7) lethal injection or Florida's procedures implementing lethal injection constitute cruel punishment, unusual punishment, or both; and (8) the trial court and prosecutor engaged in an improper ex parte communication during the 1977 trial, and postconviction counsel was ineffective for failing to raise this issue.
[5] King contends that: (1) appellate counsel was ineffective for failing to challenge the trial court's rulings allowing a State witness to testify that blood on King's clothes was human blood; (2) appellate counsel was ineffective for failing to challenge the trial court's ruling which allowed the State to bolster James McDonough's credibility with irrelevant information; (3) appellate counsel was ineffective for failing to challenge inadmissible hearsay statements made during Carlos Hudson's testimony; (4) appellate counsel was ineffective for failing to challenge inadmissible hearsay statements made during Detective Bragdon's testimony; (5) appellate counsel was ineffective for failing to raise as an appellate point the prosecutor's improper future dangerousness argument during the guilt phase closing; (6) the prosecutor committed fundamental error in the guilt phase closing argument when the prosecutor denigrated defense counsel; (7) appellate counsel was ineffective for failing to address on direct appeal the ex parte communication between the trial court and the prosecutor; (8) appellate counsel was ineffective or violated a duty by failing to ensure the preservation of physical evidence; (9) Florida's death sentencing statute is unconstitutional as applied in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (10) incarceration on death row for twenty-five years violates the Eighth Amendment's prohibition against cruel and unusual punishment; and (11) Florida's clemency process violates the Due Process and Equal Protection Clauses of the United States and Florida Constitutions.
[6] The Florida Department of Law Enforcement (FDLE) lab had previously attempted to test the fingernail scrapings taken from Brady and found the sample to be insufficient for testing purposes utilizing the STR DNA method.
[7] The trial court also commented:

While this may not be pertinent to the claim as raised, this court feels compelled to point out to the defendant that if he had not destroyed the pants he had been wearing on the night of the murder, and the attempted murder, the blood present on those pants could have been tested at the time of his trial to see if it matched the blood type of the victim, Mrs. Brady, as the state suggested, or the blood type of the victim, corrections officer James McDonough, as the defense suggested. The pants the defendant wore on the night of this homicide, and attempted homicide would have been introduced into evidence at King's trial, and would still be in evidence at the clerk's office. Today, the blood on those same pants could be analyzed for DNA, and if it still existed in sufficient quantity to be tested, Mrs. Brady's DNA could be either included or excluded. This potential evidence was lost to the state and the defendant, both at trial and now, through the exclusive actions of the defendant. Since the defendant admitted to the detectives that he had stabbed James McDonough, (although he contended it was in self defense) when he agreed to talk to the detectives in this case after he turned himself in, and he knew they were seeking his pants worn the night in question, why did he take them on a wild goose chase in search of the pants? (R. 1706-1708, 1752-1762. Please note that all record pages referred to in this order are attached in sequence as composite exhibit A). One can only surmise that the blood type present on the pants was not helpful to the defendant's position then or now.
State v. King, order at 12-13.
[8] King's arguments in his seventh contention regarding lethal injection have been repeatedly rejected by this Court and are therefore meritless. See Provenzano v. State, 761 So.2d 1097, 1099 (Fla.2000) (holding execution by lethal injection does not constitute cruel punishment or unusual punishment or both); Sims v. State, 754 So.2d 657, 666-69 (Fla. 2000), cert. denied, 528 U.S. 1183, 120 S.Ct. 1233, 145 L.Ed.2d 1122 (2000) (Florida Department of Corrections procedures for the application of lethal injection do not constitute cruel and unusual punishment).
[9] Claims one, two, three, four, five, six, and eight are procedurally barred as those claims could have and therefore should have been raised in a previous state petition for habeas corpus. See Johnson, 647 So.2d at 109.