[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-11416

_____

GREGORY LAMAR BLACKMON,

Petitioner-Appellant,

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:15-cv-00161-WS-GRJ

_____

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

Florida prisoner Gregory Lamar Blackmon appeals the District Court's denial of his 28 U.S.C. § 2254 habeas petition. We issued a certificate of appealability on the following two issues:

> (1) Whether the Florida District Court of Appeal ("DCA") denial of Blackmon's claim that his appellate attorney rendered ineffective assistance of counsel in not assigning as error in the appeal of Blackmon's conviction of armed robbery the trial court's failure *sua sponte* to inform Blackmon of the dangers of joint representation constituted a decision that was contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

> (2) Whether the DCA denial of Blackmon's claim that his trial attorney rendered ineffective assistance of counsel in failing to object to the prosecutor's comments in closing argument to the jury about the truthfulness of Michael Chester's testimony constituted a decision that was contrary to or an unreasonable application of *Strickland v. Washington*.[1]

---

[1] We have rephrased the issues for purposes of clarity. The original language was as follows: (1) "Whether Mr. Blackmon's appellate counsel was ineffective for failing to argue that the trial court erred in its treatment of Mr. Blackmon's decision to be jointly represented by his co-defendant's counsel, and whether

We conclude that the District Court properly denied Blackmon's § 2254 habeas petition.

## I.

### A.

On August 14, 2009, Michael Moore, the manager of Sonny's BBQ restaurant on North Monroe Street in Tallahassee, Florida, had just finished closing the restaurant for the night and was walking towards his car when he was approached by three masked men in the parking lot.   Moore attempted to get into his car and drive away, but the men forced him out of his car at gunpoint and tied his hands.  The men then instructed him to unlock the restaurant, turn off the alarm, open the safe and give them its contents, which he did.  The men then "hog-tied" Moore with wire and left.  Moore quickly freed himself and called 9-1-1.  The incident was captured on the restaurant's surveillance video.

On September 2, 2009, while in custody for an armed robbery of a Chevron gas station, Michael Chester told the

---

the state court's ruling on this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts" and (2) "Whether Mr. Blackmon's trial counsel was ineffective for failing to object to the prosecutor's comments in closing about the truthfulness of Michael Chester's testimony, and whether the state postconviction court's ruling was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts."

Tallahassee police that he was involved in the Sonny's robbery[2] along with four other men: Jermaine Earl, Charles Green, Gregory Blackmon, and an unidentified man.[3]  Chester explained that he, Green, and Earl were the three masked gunmen who accosted Moore and committed the robbery and that Blackmon and the unidentified man had been driving back and forth on North Monroe Street in front of Sonny's acting as lookouts.  He said that Blackmon had communicated with Earl by cellphone during the robbery.

During their subsequent investigation, the Tallahassee police recovered clothing in Earl's residence that matched clothing worn by one of the robbers depicted on the Sonny's surveillance video.  The police also obtained the cell phone records for both Blackmon and Earl's phones; the records indicated that they had been talking to each other during the time in which the robbery occurred.  The records also indicated that

---

[2] Chester was arrested for the armed robbery of the Chevron station on August 20, 2009, and detained in the Leon County, Florida, jail. On September 2, 2009, he confessed to the Tallahassee police that he was involved in that robbery, a robbery at Cash Advance, and the Sonny's robbery.

[3] Chester could not remember the man's name but seemed to remember that the man had worked at Sonny's previously.  The man told the group where the safe was located and the name of Sonny's manager.

both Blackmon and Earl were in the area around Sonny's at the time of the robbery.[4]

On September 4, 2009, the Tallahassee police arrested Blackmon for the Sonny's robbery[5] and ten days later the State Attorney of Leon County filed an information charging him with the crime.[6] The State Attorney filed a separate information against Earl. It charged him with kidnapping in addition to the Sonny's robbery.[7] Both Blackmon and Earl pled not guilty and were provided court-appointed counsel. Because the same evidence would be presented against both defendants, the State moved the Court on February 5, 2010, to consolidate Blackmon's trial with

[4] At trial, Detective Corbitt explained that an individual cell phone is always in contact with cellular telephone towers or cell site locations. Furthermore, a phone is constantly looking for the cellular tower or cellular site with the strongest signal; this is typically the cellular tower or cellular site closest to it. Cell phone carriers (such as AT&T or Verizon) record the cellular tower(s) or cellular site(s) that a phone is using for any given telephone call. Armed with this data, the police determined the general area in which Blackmon and Earl's cell phones were being used at the time of the robbery.

[5] Blackmon was arrested on September 4, 2009. Earl was arrested shortly thereafter. A warrant was issued for Green's arrest, but as of the time of Blackmon's trial, the police had been unable to execute it. Officer Boccio testified that the warrant for Green was outstanding.

[6] The information was filed in the Circuit Court of Leon County. The State Attorney filed like informations against Earl and Chester.

[7] During a pretrial hearing, the prosecutor noted that while Blackmon had not been charged with kidnapping, such a charge could certainly follow.

Earl's.  The Court granted the motion and ordered Blackmon and Earl to be tried jointly but with separate juries. Following consolidation, Earl and Blackmon both retained John Edward Eagen to represent them.

On May 20, 2010, the Court set Earl and Blackmon's trial date for the week of June 14, 2010.  Prior to jury selection, Eagen informed the Court that Blackmon was concerned about how the joint trials would proceed, and that he was trying to explain the procedure to Blackmon.  During the Court-counsel colloquy that ensued, Blackmon interrupted to say: "my concern was trying to get my point of innocence across to just my jury. I [don't] want them to be distracted with other evidence because on my evidence, you know, they got me on whatever."   The Court, the prosecutor, and Eagen all explained to Blackmon that, because he was being tried as a principal to armed robbery, the State would present the same evidence regardless of whether the two trials were consolidated.  Blackmon then stated that he understood that the same evidence would be presented, but that he did not want the same jury as Earl.  Eagen again explained to Blackmon that he and Earl would have separate juries.

At the end of this discussion, the prosecutor asked the Court "[i]f we could also reiterate [on the record] the waiver of [Blackmon and Earl] being represented by the same counsel for appellate purposes. I don't want this to be an issue for appeal later. They chose to hire the same attorney. I want to make sure it's clear they're waiving that conflict." Eagen responded, "We've done that

so many times.  We'll do it one more time.  You guys are fine with me representing both of you correct?"  Blackmon responded, "Only if you argue in front of two different juries."  Earl nodded his head yes in response to the question.

<em>B.</em>

At trial, Chester testified in the State's case.[8]  He was its key witness in that he was the only one who could relate how the robbery was planned and, in particular, the roles Blackmon and Earl played.  He presented the following story: at some point prior to the robbery, he had been staying at the Roadway Inn across the street from Sonny's when Blackmon told him that he had a plan in the works to rob the restaurant.  A few days before the robbery took place, Chester, Earl, and Green "cased" Sonny's and observed how many people were working there and at what time they left work.

Chester then told the jury how the robbery was carried out and how afterwards he, Green, the unidentified man, Blackmon and Earl met at Earl's house to divide up the money. His description mirrored what he had told the police and the events set out in subpart A.  Chester's testimony focused, in part, on Blackmon and Earl's involvement—especially the phone conversations they had while the robbery was in progress.

---

[8] Chester hoped that the prosecutor would recommend a lenient sentence.

In cross-examining Chester, Eagen zeroed in on those conversations. He cast doubt on how Chester could have known that Blackmon was in fact acting as a look out, given North Monroe Street was not visible from the woods behind Sonny's.

> Eagen: And when you and Mr. Green and Mr.—and you say Mr. Earl were in the woods, right?
>
> Chester: Yes, sir.
>
> Eagen: You were saying they were talking on the phones, right?
>
> Chester: Yes, sir.
>
> Eagen: And you're saying—how do you know if you were in the woods, okay, and in the—can you see North Monroe from where you were?
>
> Chester: From in the woods?
>
> Eagen: Yeah, from the back of Sonny's?
>
> Chester: No, sir.
>
> Eagen: Then how do you know that Mr. Blackmon was driving up and down the highway—the road on Monroe?
>
> Chester: Because that's where he told us he was going to be at—
>
> Eagen: I didn't ask you that. I asked— you don't have any personal knowledge where Mr. Blackmon was that night? You're assuming he was doing that? That's what you believe, okay, correct?
>
> Chester: I guess so, sir.

On redirect, the prosecutor further questioned Chester about Blackmon and Earl's phone communications.

Prosecutor: When is the last time you saw Gregory Blackmon when you were on your way to Sonny's?

Chester: When we left the house.

Prosecutor: And when is the first time you saw him after the robbery?

Chester: Back at the house.

Prosecutor: Did Gregory Blackmon make any statements to you that he was doing what he said he would, that he was patrolling that street to look out?

Chester: Yea, when we were in the woods when [Earl] called [Blackmon], [Earl] had told me too.

Eagen: Objection, hearsay upon hearsay.

Court: Overruled.

Prosecutor: Go ahead, Mr. Chester. You can answer.

Chester: When [Earl] was calling [Blackmon] in the woods, that's what [Blackmon] told [Earl]. [Earl] said [Blackmon] was going—[Earl] said, I just saw [Blackmon's] car go past because by the garbage cans you can see the street.

In addition to Chester's testimony, the State presented testimony from several officers who had been part of the investigation of the Sonny's robbery. In particular, Investigator

Scott Cherry testified that a search of Earl's residence had yielded clothing consistent with what was seen on the surveillance video of the robbery, as well as two cell phones. Officer Christopher Corbitt, an expert on cell phone tracking, testified that the cell phone records retrieved from Blackmon and Earl's phones suggested that Blackmon and Earl had been talking to each other at the time of the robbery and that their phones had both been in close proximity to Sonny's at that time as well.

The defense's closing jury arguments in the two cases were held separately. Thus, Eagen first addressed the jury in Blackmon's case (and in the absence of Earl's jury), and then the jury in Earl's case (and in the absence of Blackmon's jury). In summing up the case against Blackmon, Eagen argued that the State's case was weak, one based on Chester's testimony and little else. There was "no fingerprint evidence, no DNA, no footprints." The cellphone records showed that Blackmon and Earl were talking to each other on the night of the robbery in the vicinity of Sonny's, but Earl and Blackmon could have been "driving around as people do, talk[ing] on the cell phone as people do." And Chester's testimony, Eagen repeatedly emphasized, was suspect because Chester was "not a good Samaritan coming forth and saying, I am going to be truthful." Chester, Eagen pointed out, was "out for [Chester]." "He's got a motive to do the best he can to give [the State] the information" it wants in exchange for a more lenient sentence.

The prosecutor, in contrast, reminded the jury of each piece of evidence that corroborated Chester's testimony—including the

cell phone data and the clothing at Earl's residence—and urged the jury to recognize that "[i]t all starts to add up when you look at the big picture and when you use [Chester's] testimony as the glue to hold it all together."    The prosecutor addressed Chester's credibility several times, always without a defense objection.  We excerpt the relevant portions:

> Prosecutor: Michael Chester told you himself, that's him. He has accepted responsibility for this case. He has told you, I went in there, and I robbed Sonny's.

He's not trying to hide anything. He's not trying to make himself sound better.  But he has come in here and been honest with you about his involvement.  And, yes, he does expect to get something from it.  He    expects some consideration because he has been honest with law enforcement back in September.  He has been honest with us, and he has been honest with you–all here today.

> . . .

> He hasn't been untruthful. If he came up here and lied, that's perjury.

### C.

The jury found Blackmon guilty as charged, and the Circuit Court sentenced him as a prison releasee reoffender ("PRR") to life imprisonment.  Blackmon appealed his conviction and sentence to the DCA.  He presented two claims of trial court error: (1) the trial court erred in denying his peremptory challenge to a prospective juror under *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712 (1986),

18-11416                Opinion of the Court                12

and (2) the trial court erred in sentencing him as a PRR because his PRR status was not alleged in the information.[9]    The DCA affirmed Blackmon's conviction and sentence per curiam, without an explanatory opinion. *State v. Blackmon,* 75 So. 3d 270 (Fla. 1st. Dist. Ct. App. 2011).

On September 4, 2012, Blackmon, proceeding *pro se,* filed a petition for writ of habeas corpus in the DCA alleging ineffective assistance of appellate counsel under *Strickland.*[10]  He argued that his appellate counsel was ineffective in failing to present several claims of trial court error on direct appeal.[11]    Only one of the claims is relevant here: that his appellate counsel was ineffective in failing to argue that the trial court erred when it did not advise Blackmon *sua sponte* of the dangers of joint representation. Blackmon alleged that the court committed this error twice.  The first error occurred, Blackmon claimed, during the colloquy between the Court, Blackmon, Eagen, and the prosecutor prior to jury selection after Blackmon said he was "concerned about

---

[9] These claims are not pertinent to the appeal before us.

[10] Under Florida law, claims of ineffective assistance of appellate counsel are brought before the DCA in the form of a habeas petition. *Francois v. Klein*, 431 So. 2d 165, 166 (Fla. 1983).  Claims of ineffective trial counsel are presented to the trial court by a Rule 3.850 motion under the Florida Rules of Criminal Procedure. *Id.*

[11] Blackmon's claims were that the trial court erred (1) in overruling a hearsay objection; (2) in denying his motion to strike two jurors for cause; and (3) in failing to advise him of the dangers of joint representation.

18-11416                Opinion of the Court                13

counsel's ability to provide him a fair trial due to [counsel] jointly representing both Petitioner and codefendant Earl." This expression of concern, Blackmon asserted, should have prompted the Court to intervene *sua sponte* and inform him of the dangers of joint representation.    The second error occurred, according to Blackmon, during Chester's testimony when, over Eagen's hearsay objection, Chester told the jury about the phone call that took place between Earl and Blackmon during the robbery.[12] Blackmon's petition described the trial court's error in failing to intervene thus:

> [Blackmon] wanted to testify to the fact that Mr. Chester and Earl owed him a large sum of money for a drug debt and that he had threaten[ed] to do bodily harm to Mr. Chester if he did not come up with the money soon. . . . [It] was the trial court's duty even if it was not aware of Petitioner's desire to testify, to stop the trial and conduct a hearing, when it permitted the incriminating hearsay testimony of Mr. Chester to be introduced.  As, it was clearly obvious that, in light of Mr. Chester's testimony regarding what . . . Earl told him about petitioner, [Eagen] was placed in a peculiar situation as to how he would defend Petitioner from this hearsay accusation.  And therefore, the court err[ed] . . . by failing to stop the trial and conduct[ ] a hearing to assure Petitioner's

---

[12] See part I.B.

constitutional rights to effective counsel were protected.

The DCA denied the petition on the merits per curiam, without an explanatory opinion. *State v. Blackmon,* 98 So. 3d 201 (Fla. 1st. Dist. Ct. App. 2012).

On November 10, 2012, Blackmon moved the Circuit Court for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. He submitted an amended petition on October 2, 2013. His motion presented five claims.[13] Only one is relevant here: his trial counsel was ineffective under *Strickland* for failing to object to the prosecutor's improper bolstering of Chester's testimony in closing argument to the jury. failure to object, Blackmon argued, prejudiced his defense because Chester's "credibility lay at the heart of the State's case."

The Circuit Court conducted an evidentiary hearing on Blackmon's motion. Eagen testified that his practice was to refrain from objecting to a prosecutor's statement during closing argument because "all it does is draw more attention to the statement." The Court found this to be a credible strategy, noting

---

[13] The claims were: that trial counsel was ineffective for (1) failing to object to the prosecutor's improper bolstering of Chester's testimony in summing up the State's case before the jury, (2) failing to impeach Chester's testimony, (3) failing to request an accomplice instruction to the jury, (4) failing to impeach Investigator Cherry's testimony, and (5) failing to present alibi witnesses.

that "[m]any attorneys take the view, as Eagen did, that, in the absence of something very egregious, it's simply better not to object and not call attention to the state's closing." The Court therefore denied relief on Blackmon's ineffective assistance claim.[14] Blackmon appealed the decision to the DCA. The DCA affirmed it per curiam in without an explanatory opinion. *State v. Blackmon,* 150 So. 3d 1135 (Fla. 1st. Dist. Ct. App. 2014).

### D.

On March 20, 2015, having exhausted his state remedies, Blackmon, proceeding *pro se,* petitioned the U. S. District Court for the Northern District of Florida for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[15] In an amended petition, he presented ten claims.[16]  Two are now before us: (1) appellate

---

[14] The trial court rejected Blackmon's other ineffective assistance of counsel claims as well.

[15] Blackmon proceeded *pro se* throughout the litigation of his habeas petition in the District Court.

[16] Blackmon asserted the following claims: (1) the trial court erred in denying, under *Batson*, his attempt to exercise a peremptory challenge to excuse a potential juror; (2) appellate counsel was ineffective for failing to appeal the hearsay objection to Chester's testimony regarding Blackmon and Earl's phone calls; (3) appellate counsel was ineffective for failing to appeal the trial court's failure to advise Blackmon of the dangers of joint representation; (4) trial counsel was ineffective for failing to impeach Chester; (5) trial counsel was ineffective for failing to object to the State's closing argument; (6) trial counsel was ineffective for failing to request an accomplice argument; (7) trial counsel was ineffective for failing to impeach Officer Cherry; (8) trial counsel

counsel rendered ineffective assistance, on direct appeal, in not assigning as error the trial court's failure to inform Blackmon *sua sponte* of the dangers of joint representation on two occasions[17] and (2) trial counsel was ineffective in failing to object when the prosecutor bolstered Chester's credibility during his closing argument to the jury.

Recall that that the DCA denied the first claim in denying Blackmon's habeas petition without an explanatory opinion. The

---

was ineffective for failing to present alibi testimony; (9) collateral counsel was ineffective for failing to appeal all 3.850 claims; and, finally, (10) cumulative error.

[17] Blackmon's amended habeas petition stated the ground as being: "Ineffective assistance[] of appellate counsel for failure to present claim that trial court committed revers[i]ble error by failing to advise petitioner of the adverse consequences of joint representation and allowing joint representation to continue after materialization of manifest conflict of interest." In the "supporting facts" section of the amended petition, Blackmon mostly detailed the facts about the colloquy among the Court, Eagen, the prosecutor, and himself that occurred prior to jury selection, but not about Chester's testimony. The court allowed Blackmon to add an attachment to the amended petition that stated, among other things: "Materialization of manifest conflict also occur[r]ed when the actual conflict of counsel not able to put Earl on stand to refute Chester[']s testimony." Because this Court has held that "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys" and that such pleadings are to be "liberally construed," we read Blackmon's ineffective assistance of appellate counsel claim as including a claim based on Chester's testimony. *See Trawinski v. United Techs.*, 313 F.3d 1295, 1297 (11th Cir. 2002) (citing *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam)). Neither the Magistrate Judge nor the District Court considered the claim as it relates to Chester's testimony. We therefore review that claim *de novo* in part III.A.ii.

DCA also denied the second claim, without an explanatory opinion, when it affirmed the Circuit Court's denial of his Rule 3.850 motion. The District Court's task under § 2254 was to determine whether the DCA's adjudication of each claim (1) resulted in a decision that was "contrary to, or involved an unreasonable application of," the Supreme Court's holdings in *Strickland* or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

Because the DCA adjudicated each of the claims per curiam without explanation, the District Court's review of its decisions was necessarily guided by the Supreme Court's instructions in *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786 (2011), and *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). With respect to the habeas petition Blackmon presented to the DCA, because there was no underlying state court reasoning to review, the District Court was required to "determine what arguments or theories . . . could have support[ed] the [DCA's] decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Richter*, 562 U.S.at 102, 131 S. Ct. at 786.

With respect to the Rule 3.850 motion Blackmon presented to the DCA, because the Circuit Court stated on record its reasons for denying the motion, the District Court was required to employ the "look through" technique to consider the grounds the Circuit Court articulated in rejecting Blackmon's ineffective assistance of

trial counsel claim. *Sellers*, 138 S. Ct. at 1193 (holding that federal courts should "look through" the unexplained state decision to the last related state-court decision that does provide a relevant rationale).

The District Court assigned the task of reviewing the respective DCA decisions under *Richter* and *Sellers* to a Magistrate Judge for the issuance of a report and recommendation ("R&R")[18] as to the appropriate disposition of Blackmon's claims. The Magistrate Judge issued an R&R on January 31, 2018, in which he recommended that the District Court deny Blackmon's § 2254 petition. We report the Magistrate Judge's analysis of each claim in turn.

As noted earlier,[19] Blackmon's amended § 2254 habeas petition had two factual predicates presented in support of his claim of ineffective assistance of appellate counsel. The Magistrate Judge reviewed only the ineffective assistance claim,[20] based on Blackmon's argument that the trial court should have advised him of the dangers of joint representation following the pre-trial colloquy between Eagen, the prosecutor, Blackmon, and the

---

[18] *See* 28 U.S.C. § 636(b)(1)(B).

[19] *See supra* note 17.

[20] The same was true for the District Court given it adopted the Magistrate Judge's R&R in full.

18-11416               Opinion of the Court                    19

Court.[21]    The Magistrate Judge found Blackmon's claim to be "refuted by the trial record" detailing that colloquy and, moreover, by the record of the hearing the trial court held on Blackmon's motion for a new trial.[22]   As the Magistrate Judge explained:

> Prior to jury selection, Petitioner expressed concerns about the case having been consolidated pursuant to the State's motion. The reason for consolidation was that identical evidence would be presented against both Petitioner and Jermaine Earl, although Earl was facing a kidnaping charge as a result of the crime, in addition to an armed robbery charge. Petitioner expressed that the jury might hear evidence relevant to the kidnaping charge that did not apply to him, but the court, the State, and defense counsel confirmed on the record that the evidence against both defendants was identical—the actions taken against the victim on the night of the robbery were also relevant to show that Petitioner was culpable as a principal to the crime of armed robbery. Counsel and the trial court affirmed that separate juries would

---

[21] The colloquy is set out in part I.A.

[22] In denying the claim on the basis of the record, the Magistrate Judge was following the Supreme Court's instructions in *Richter*, albeit tacitly, to "determine what arguments or theories" the DCA could have drawn on in concluding that appellate counsel was not ineffective. Given his reasons for rejecting the claim under the criteria of § 2254(d), the Magistrate Judge effectively concluded, in keeping with *Richter's* instructions, that it was possible that a fairminded jurist could conclude that such reasons were consistent with the Supreme Court's holdings in *Strickland*.

consider the charges against each defendant. Petitioner had previously executed a waiver of his right to separate counsel. Prior to jury selection, Petitioner affirmed on the record that he agreed to joint representation by Eagen so long as two different juries were utilized.

Following the trial, Petitioner filed a *pro se* motion for a new trial. At the hearing on the motion, the trial court reaffirmed that Petitioner and Earl had waived separate representation for purposes of their consolidated trial. The court observed that Petitioner and Earl had maintained their desire to be represented jointly by Eagen, provided that they each had a different jury. When Petitioner asserted that he personally did not think Eagen could represent both defendants, the court stated "[a]t every stage I asked you about that and you indicated that you were confident going with Mr. Eagen as the sole attorney." Petitioner responded "I know, at every stage I kept saying that," until he realized the case was "reconsolidated." The record reflects that the concerns raised by Petitioner to the trial court were focused on potential adverse consequences from a *consolidated trial* rather than joint representation. As noted above, Petitioner agreed on the record that throughout the proceedings he had assented to joint representation by Eagen. Even if the trial court erred in some way in explaining any potential adverse consequences of joint representation, Petitioner points to nothing in the record that would support a

conclusion that he was prejudiced by appellate counsel's failure to raise this as an issue on direct appeal. The record reflects that Petitioner's primary complaint in the trial court was that the defendants would be tried by separate juries, and that is what he received. Again, appellate counsel's failure to raise a claim will not be found prejudicial unless the claim would have a reasonable probability of success on appeal. Petitioner points to nothing in the record that would support a conclusion that his trial was prejudiced as a result of the joint representation by Eagen and the use of two jury panels, as Petitioner requested. . . . . Thus, Petitioner has failed to show that the state court's rejection of this ineffective-assistance claim was contrary to, or an unreasonable application of, [*Strickland*'s holdings], or resulted in an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

Blackmon's second claim was that trial counsel was ineffective "for failing to object to the State's closing argument . . . that Chester had been honest with the jury regarding his involvement in the robbery . . . [and] that [his] testimony was unwavering, truthful, and that he had accepted responsibility for the crime." According to Blackmon, this "argument amounted to impermissible vouching."

The Magistrate Judge recommended that the District Court deny the claim. The Magistrate Judge noted that although the Circuit Court acknowledged that the prosecutor's comments may have been improper, the Circuit Court also found that it was a reasonable strategy on the part of defense counsel not to object. Further, the Magistrate Judge, like the Circuit Court, concluded that "there [was] no possibility" that the State's comments rendered the trial fundamentally unfair. Because of this, the Magistrate Judge found that Blackmon had failed to show that the state court's rejection of this ineffective assistance claim was contrary to, or an unreasonable application of any of *Strickland's* holdings.

Blackmon timely objected to the Magistrate Judge's R&R dispositions, including its recommendation that the District Court deny the two claims we consider here.[23] On March 5, 2018, the District Court overruled Blackmon's objections to the R&R, adopted the R&R, and denied Blackmon's petition for a writ of habeas corpus and his application for a certificate of appealability.[24] Blackmon appealed the District Court's decision and on April 22, 2019, this Court issued a certificate of appealability on the two issues set out in the beginning of this opinion.

---

[23] Blackmon's objections are quite rambling. The gist of his objections is that the Magistrate Judge failed to fully comprehend his claims.

[24] *See* 28 U.S.C. § 2253(c)(2).

## III.

When reviewing a district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error.[25] *See King v. Moore*, 196 F.3d 1327, 1330 (11th Cir. 1999).  The findings of fact the Circuit Court made in adjudicating Blackmon's Rule 3.850 motion and the District Court considered in deciding Blackmon's ineffective assistance of trial counsel claim are presumed "to be correct."  28 U.S.C. § 2254(e)(1).

We evaluate Blackmon's ineffective assistance claims under the two-prong test set forth in *Strickland.*  To prevail on an ineffective-assistance claim, the petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  466 U.S. at 687, 104 S. Ct. at 2064.

The performance prong is satisfied if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064.  Because "[t]here are countless ways to provide effective assistance in any given case," *id.* at 689, 104 S. Ct. at 2065, "the range of what might be a reasonable approach at trial must be broad." *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Thus, "a

---

[25] The District Court made no findings of fact in deciding the claims Blackmon's § 2254 petition presented.

petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315.

The prejudice prong requires the petitioner to establish a "reasonable probability" that, but for counsel's errors, the outcome at trial would have been different. *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

With the foregoing principles in hand, we consider Blackmon's arguments that the District Court erred in holding that the state courts' adjudications of his claims of ineffective assistance of trial and appellate counsel were unassailable under 28 U.S.C. § 2254(d)(1) or (2). We start in subpart A where Blackmon began, with his assertion that appellate counsel should have assigned as error the trial court's failure *sua sponte* to inform him of the dangers of joint representation (1) during the colloquy that took place prior to jury selection and (2) after Chester testified about the phone call that occurred between Earl and Blackmon during the robbery. Then, in subpart B, we consider Blackmon's assertion that trial counsel should have objected to the prosecutor's vouching of Chester's testimony before the jury in closing argument.

*A.*

*i.*

Although Blackmon stated in his habeas petition that he told the trial court, prior to jury selection, he was worried about Eagen's ability to represent both himself and Earl, the trial

transcript makes it quite clear that Blackmon's concern centered on the consolidation of his and Earl's trials, *not* joint representation. The trial court appropriately responded to Blackmon's concern by explaining why Blackmon would not be prejudiced by a joint trial: because the State had charged Blackmon as a principal in the armed robbery, all of the evidence that would be introduced in Earl's trial would be introduced in his as well.[26]  Certainly nothing in this discussion would have suggested to the trial court that Eagen could not effectively represent both defendants.  As the Magistrate Judge noted, Blackmon "had previously executed a waiver of his right to separate counsel." And he had "agreed on the record . . . throughout the proceedings [that] he had assented to joint representation by Eagen."

In sum, the fact that Blackmon was concerned about a joint trial, not joint representation, fully supports the DCA's rejection of this ineffective assistance claim.  The DCA would have considered meritless appellate counsel's argument that the trial court erred in failing *sua sponte* to inform Blackmon of the potential shortcomings of joint representation.  Thus, counsel's failure to

---

[26] In briefing this appeal, Blackmon focuses on whether his "waiver" of his right to separate counsel was adequate under the law.  But this question is irrelevant for our purposes.  The relevant question is whether the court had a duty to *sua sponte* advise Blackmon of the adverse consequences of joint representation based on the discussion that took place prior to jury selection. Because we conclude that the court was under no such duty, whether the "waiver" the prosecutor wanted the record to reflect was valid is inconsequential.

raise it in briefing Blackmon's appeal could not amount to ineffective assistance under *Strickland.*

*ii.*

The DCA likewise would have held meritless the same failure-to-inform argument based on Chester's testimony during the prosecutor's redirect examination about the Blackmon-Earl phone call. Eagen had just finished cross-examining Chester in an effort to cast doubt on whether Blackmon had truly acted as a lookout when the prosecutor asked Chester on redirect about the phone call (to which Eagen immediately objected unsuccessfully). Chester's testimony about the phone call, according to Blackmon, somehow meant that Eagen could no longer represent both defendants competently, that Eagen was favoring Earl over Blackmon, and that the court had to intervene immediately.[27] Nothing in Eagen's cross-examination of Chester, however, which obviously was in Blackmon's best interests, would have suggested to the trial court that Eagen was favoring Earl over Blackmon and

---

[27] In his state habeas petition to the DCA, Blackmon also argued that after hearing Chester's testimony, he decided that he wanted to testify but Eagen prevented him from doing so. In Blackmon's mind, Eagen prevented him from testifying because Eagen felt that his testimony would be harmful to Earl. At no point in his habeas petition, however, did Blackmon suggest that the trial court was made aware of his desire to testify. The trial judge could not be charged with reading Blackmon's mind, and he was not privy to any private conversations that may have taken place between Blackmon and Eagen. The law does not fault a judge for such limitations.

18-11416                Opinion of the Court                27

that it had to excuse the jury and hold a hearing on the issue of joint representation.[28]  Again, counsel's failure to assert the failure-to-inform theory as trial court error in briefing Blackmon's appeal could not amount to ineffective assistance under *Strickland*.

*B.*

We turn now to Blackmon's claim that Eagen rendered ineffective assistance in failing to object to the prosecutor's bolstering of Chester's testimony in his closing argument to the jury.[29]  The Circuit Court denied the claim following an evidentiary hearing in which Eagen testified. The DCA affirmed. In reviewing the DCA's decision, the District Court "looked through" the DCA's decision and reviewed the Circuit Court's decision as *Sellers* instructs.  138 S. Ct. at 1188.

Bolstering occurs when "'the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.'" *United States v. Knowles*, 66 F.3d 1146, 1161 n.60 (11th Cir. 1995) (quoting *United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983)).  Because Chester's testimony was so central to the State's case, Blackmon argued, Eagen's failure to object to any

---

[28] We are mindful of the principle that a trial court must initiate an inquiry into the propriety of joint representation when it "knows or reasonably should know that a particular conflict exists." *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S. Ct. 1708, 1717 (1980).

[29] The prosecutor's bolstering is set out in part I.B.

improper bolstering was a serious error and one that competent counsel would not have made. Without the bolstering, Blackmon continues, the jury likely would have acquitted him because "the state presented almost no other evidence of [his] guilt aside from Chester's accusations."

The Circuit Court found no merit in Blackmon's ineffective assistance claim.   The Circuit Court noted that it had "heard a lot of defense attorneys talk about their different strategies in closing arguments.  Many attorneys take the view, as Mr. Eagen did, that, in the absence of something very egregious, it's simply better not to object and not call attention to the State's closing." Although the Circuit Court stated that the comments were probably improper, it still found that Eagen's decision not to object did not constitute deficient performance under *Strickland* because "reasonable attorneys could differ on that strategy." Given this finding, the Court logically concluded that Blackmon had failed to satisfy the *Strickland* performance test—that Eagen's performance was so deficient that he was not functioning as the counsel guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

The Circuit Court was bound to reach that conclusion.  The Supreme Court made clear in *Strickland* that "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound

trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955)). This is so, the Supreme Court explained, because "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* (citing Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L. REV. 299, 343 (1983)).

The District Court correctly concluded that Blackmon failed to establish that the DCA's affirmance of this ineffective assistance claim constituted an adjudication that was "contrary to, or an incorrect application of," the Supreme Court's holdings in *Strickland.*

## IV.

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED**.